**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA | : |
| | : CIVIL ACTION NO._____ |
| | : |
| Plaintiffs, | : **COMPLAINT** |
| | : |
| v. | : **DEMAND FOR JURY TRIAL** |
| | : |
| BIONTECH SE and BIONTECH RNA PHARMACEUTICALS GMBH | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff, The Trustees of the University of Pennsylvania ("Penn"), by and through its attorneys, for its complaint against BioNTech SE and BioNTech RNA Pharmaceuticals GmbH (collectively "BioNTech"), alleges as follows:

## PRELIMINARY STATEMENT

1.     This is an action to compel BioNTech to comply fully with royalty obligations owed to Penn under a patent sublicense agreement that permitted BioNTech to use Penn's Nobel-prize winning inventions in BioNTech's COVID-19 vaccine, Comirnaty®.

2.     BioNTech is failing to meet its royalty obligations for two separate reasons. *First*, BioNTech is paying royalties only for products sold into a country where Penn has a patent, but under the parties' royalty agreement BioNTech has the obligation to pay a royalty if the patented product is made in a country where Penn has a patent, regardless of where the product is ultimately administered. BioNTech manufactures Comirnaty®—a drug product that uses Penn's patented

1

mRNA technology—in countries where Penn has patents in force, triggering a royalty on all products. For that reason, BioNTech must pay royalties as a percentage of its entire worldwide sales and not, as it has done to date, on only a portion of its worldwide sales. *Second*, BioNTech is failing to meet its royalty obligation because it applies an inappropriate deduction for supposed royalties paid to third parties. Under the terms of the parties' patent sublicense agreement, if BioNTech is obligated to pay royalties to a third party in excess of a specified percentage of its net worldwide sales and provides appropriate documentation to Penn, then it may deduct a portion of certain royalties payable to Penn. But based on the incomplete royalty reports provided to date, BioNTech has never met the threshold necessary to avail itself to a reduction based on royalties paid to third parties.

3.      Penn is a university focused on education, scientific research, and patient care. The inventions developed at Penn—for example, the foundational messenger RNA ("mRNA") technology discovered by Dr. Katalin Karikó and Dr. Drew Weissman who were awarded the 2023 Nobel Prize in Physiology or Medicine—are licensed to private companies, such as BioNTech, in exchange for royalty payments. The revenues received by Penn from these licenses fund Penn's research that leads to the discovery of new, life-saving therapies and technologies. Penn is owed significant additional royalties that, once recouped from BioNTech, will fund further scientific research.

## THE PARTIES

4.      Penn is a Pennsylvania nonprofit corporation with its principal place of business at 3154 Walnut Street, Philadelphia, Pennsylvania 19104.

5.      Upon information and belief, BioNTech RNA Pharmaceuticals GmbH is a corporation organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, D-55131 Mainz, Germany. Upon information and belief, BioNTech SE

is a corporation organized and existing under the laws of Germany, with its principal place of business at An der Goldgrube 12, D-55131 Mainz, Germany. Upon information and belief, in June 2021, a merger agreement between BioNTech RNA Pharmaceuticals GmbH and BioNTech SE was registered within the commercial register (Handelsregister) of BioNTech SE under which BioNTech RNA Pharmaceuticals GmbH was effectively merged into BioNTech SE.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

7.      Complete diversity of citizenship exists between Plaintiff and Defendants. Penn is a is a citizen of Pennsylvania. BioNTech RNA Pharmaceuticals GmbH and BioNTech SE are citizens of Germany. None of the parties are citizens of the same state.

8.      The amount in controversy exceeds $75,000, exclusive of interest and costs. *See* ¶¶ 12–61, *infra*.

9.      This Court has personal jurisdiction over BioNTech. In particular, the patent sublicense agreement states that "the Parties will submit to the exclusive jurisdiction of, and venue in, the state and Federal courts located in the Eastern District of Pennsylvania with respect to all disputes arising under this Agreement." Patent Sublicense Agreement, dated July 19, 2017 (hereinafter, and together with all amendments thereto, "BNT Sublicense"), § 15.10. That forum-selection clause vests personal jurisdiction over BioNTech in the state and federal courts of the Eastern District of Pennsylvania for all disputes arising from the BNT Sublicense.

10.      This court also has personal jurisdiction over BioNTech because it purposefully availed itself of the privilege of conducting activities within the Commonwealth of Pennsylvania by executing a sublicense for the use of mRNA patents that it knew to be owned by a Pennsylvania-based organization (i.e., Penn). More particularly, BioNTech availed itself of the privileges of the

Commonwealth of Pennsylvania by, among other actions, executing the Second Amendment to the Patent Sublicense Agreement that made Penn a third-party beneficiary to the BNT Sublicense and noted that all payments owed by BioNTech to Cellscript "shall [now] be owed and paid directly to Penn." S*ee* ¶ 22, *infra*. Further, BioNTech has systematically and continuously directed its business activities to this judicial district by selling Comirnaty®—the primary pharmaceutical product covered by the BNT Sublicense—in the Commonwealth of Pennsylvania. BioNTech's actions giving rise to personal jurisdiction further include, but are not limited to, offering for sale and selling Comirnaty® in Pennsylvania, knowing and intending that Comirnaty® would be used in Pennsylvania, and deriving substantial revenue from the use of Comirnaty® in Pennsylvania.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(c)(3) because BioNTech is a foreign corporation. Venue is further proper in this Court under the BNT Sublicense, which subjects all parties to the jurisdiction of, and venue in, the state and federal courts of the Eastern District of Pennsylvania for all disputes arising from the BNT Sublicense. *See* BNT Sublicense, § 15.10.

## **FACTUAL ALLEGATIONS**

### **Drs. Karikó and Weissman Make Key Discoveries that Pave the Way for mRNA Vaccines Against COVID-19**

12.     By at least 2005, University of Pennsylvania employees, Drs. Karikó and Weissman, made a breakthrough discovery that overcame critical problems plaguing the use of mRNA in drugs by reducing the body's immune response to in vitro synthesized mRNA. Their discovery is now understood as foundational to mRNA vaccine development and was instrumental in the creation of a vaccine for COVID-19.[1]

---

[1] *Lasker Foundation Announces 2021 Lasker Awards*, LASKER FOUNDATION, Sept. 24, 2021, https://laskerfoundation.org/wp-content/uploads/2021/09/2021_awards_press_release.pdf.

13.     Drs. Karikó and Weissman received a plethora of awards recognizing the tremendous importance of their discoveries. These awards include the Princess of Asturias Award, the Albany Medical Center Prize in Medicine and Biomedical Research, the $3 million Breakthrough Prize, the Benjamin Franklin Medal in Life Science, and the 2021 Lasker Award—America's top biomedical research prize.[2] The Lasker Foundation concisely stated the importance of the inventive work of Drs. Karikó and Weissman, noting that the award was "for the discovery of a new therapeutic technology based on the modification of messenger RNA – enabling rapid development of highly effective Covid-19 vaccines."[3]

14.     More recently, on October 4, 2023, Drs. Karikó and Weissman were awarded the 2023 Nobel Prize in Physiology or Medicine "for their discoveries concerning base modifications that enabled the development of effective mRNA vaccines against COVID-19."[4]

15.     Drs. Karikó and Weissman, as inventors, and Penn, as sponsoring institution and assignee, secured patents covering mRNA technology in the United States and in Europe. These patents are assigned to Penn and collectively referred to herein as the "mRNA Patent Rights." By way of non-limited example, Penn's mRNA Patent Rights include at least U.S. Patent Nos. 8,691,966 and 9,750,824 and European Patent Nos. EP 2578685 and EP 3611266.

**Penn's mRNA Patent Rights are Sublicensed to BioNTech**

16.     Long before the COVID-19 pandemic, Penn licensed the mRNA Patent Rights to commercial entities who wished to bring the mRNA products to market. Between April 2010 and

---

[2] Ashley Rabinovitch, *From foundational discoveries to profound impact*, *How decades of mRNA research at Penn made powerful new COVID-19 vaccines possible—and opened a new vista for future discoveries*, PENN TODAY, Dec. 22, 2021, https://penntoday.upenn.edu/news/foundational-discoveries-pandemic-proliferation-impact-weissman-kariko.
[3] *Id.* at 1.
[4] Nobel Prize Outreach AB, *The Nobel Prize in Physiology or Medicine 2023*, NOBELPRIZE.ORG, https://www.nobelprize.org/prizes/medicine/2023/summary/ (last visited Aug. 1, 2024).

August 2020, Penn licensed these mRNA Patent Rights to a series of related entities, including Epicentre Technologies Corporation, mRNA RiboTherapeutics, Inc. ("RTX"), and Cellscript, LLC ("Cellscript"). The Cellscript entities sublicensed the Penn technology to BioNTech (as well as Moderna) ███████████████████████████████████████. By virtue of this series of agreements and related agreements, BioNTech is obliged to remit royalty payments and certain accounting directly to Penn, and Penn has the right to enforce certain BioNTech obligations directly in Penn's own name.

17.    This series of agreements includes a license from Penn to RTX, a subsequent sublicense from RTX to Cellscript, and a further sublicense from Cellscript to BioNTech. Under the series of licensing agreements, BioNTech agreed ████████████████████████ ███████████████. By a further agreement, BioNTech agreed to pay the sublicense royalties directly to Penn. BioNTech has also agreed that Penn is a third-party beneficiary of the Cellscript-BioNTech sublicense. ███████████████████████████████ ████████████████████████████████████████████ █████████

18.    The agreements include a Penn license of ████████████ to RTX. On December 20, 2016, Penn executed the Second Amended and Restated Patent License Agreement (the "PLA") with RTX. The PLA granted RTX ███████████████████████ █████████. Under the PLA, RTX was permitted to ██████████████████.

19.    RTX exercised that █████████████████████████ to Cellscript. On December 20, 2016, RTX executed an Amended and Restated Patent Sublicense Agreement with Cellscript for ██████████████████ (the "RTX-CS PSA"). Under the RTX-CS PSA, Cellscript was permitted to ██████████████████.

20.     Cellscript exercised its ability to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On July 19, 2017, Cellscript and BioNTech executed the Patent Sublicense Agreement, which granted BioNTech a non-exclusive sublicense to Penn's mRNA Patent Rights.

21.     On February 10, 2020, Cellscript and BioNTech executed the First Amendment to the Patent Sublicense Agreement (the "BNT First Amendment"), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

22.     On August 1, 2020, Cellscript and BioNTech executed the Second Amendment to the Patent Sublicense Agreement (the "BNT Second Amendment"). Under the BNT Second Amendment, BioNTech and Cellscript agreed that Penn "is the ultimate recipient of amounts of money that are payable by [BioNTech] under the terms of the [Patent Sublicense Agreement and the BNT First Amendment]" and that "all payments owed by [BioNTech] to Cellscript . . . shall [now] be owed and paid directly to Penn[.]" BNT Second Amendment, Preamble, ¶ 1. The BNT Second Amendment also explained that "[a]ll references to payments to Cellscript are understood to mean payments to Penn." *Id.*, ¶ 2. The parties executed the BNT Second Amendment with the intent that "Penn is a third-party beneficiary of the [Patent Sublicense Agreement and the BNT First Amendment]." *Id.*, ¶ 4.

23.     Together, the Patent Sublicense Agreement, BNT First Amendment, and the BNT Second Amendment form the "BNT Sublicense," which sets forth the rights and responsibilities of both Cellscript and BioNTech related to the grant of a sublicense for BioNTech's use of Penn's mRNA Patent Rights.

24.     Under the terms of the BNT Sublicense, BioNTech obtained the right to use Penn's mRNA Patent Rights to develop and commercialize products—including Comirnaty®, its successful vaccine against COVID-19. BioNTech is developing and hopes to gain approval for

several drug candidates—including, for example, oncology drugs and flu vaccines—that will also practice Penn's mRNA Patents Rights.

### **BioNTech Promises to Pay a ▮▮▮ Royalty on Net Sales of Licensed Products**

25.     In exchange for the right to use Penn's mRNA Patent Rights, BioNTech agreed that it would pay ▮▮▮ royalty (with certain exceptions) on Net Sales of Licensed Products.

26.     The BNT Sublicense defines "Net Sales" as "the consideration received or expected from, or the fair market value attributable to, each Sale, less Qualifying Costs that are directly attributable to a Sale, specifically identified on an invoice or other documentation and actually borne by [BioNTech] or its Affiliates or Third Party sublicensees." BNT Sublicense, § 3.5.3.

27.     The BNT Sublicense defines "Sale" as "any bona fide transaction for which consideration is received or expected by [BioNTech] or its Affiliates or Third Party sublicensees for the sale, use, lease, transfer or other disposition of a Licensed Product to a Third Party. A Sale is deemed completed at the time that [BioNTech] or an Affiliate or Third Party sublicensee invoices, ships or receives payment for a Licensed Product, whichever occurs first." BNT Sublicense, § 3.5.1.

28.     The BNT Sublicense defines "Licensed Products" as "products that are made, made for, used, imported, offered for sale or sold by [BioNTech] or its Affiliates or Third Party sublicensees and that, in the absence of a license to Patent Rights, (i) would infringe (or in the case of pending patent applications, upon issuance, would infringe) at least one claim of the Patent Rights or (ii) use a process or machine covered by a claim of Patent Rights, whether the claim is issued or pending. For clarity, Licensed Products includes any method, procedure or process, the use of which by [BioNTech] or its Affiliates or Third Party sublicensees, in the absence of a license to Patent Rights by the user, would infringe, induce to infringe or contribute to infringing one or

more claims of Patent Rights whether the claim is issued or pending." BNT Sublicense, § 1.2. ███

███████████████████████████████████████████████████████████████████████

███████, was included as Exhibit A to the BNT Sublicense.

29.     The royalty payment provision of the BNT Sublicense contemplates ███████████

██████████████████████████████████████████████████. As relevant here,

Section 3.4.2 of the BNT Sublicense states that "[i]n partial consideration of the Sublicense,

[BioNTech] will pay to [Penn] a ████████████████████ royalty on Net Sales of

Licensed Products in Field of Use B, including (a) all therapeutic or prophylactic uses in humans;

(b) all non-therapeutic or nonprophylactic uses in humans; and (c) all uses, including therapeutic

and prophylactic uses (e.g., Veterinary Products), in non-human animals during the Quarter." BNT

Sublicense, § 3.4.2; BNT Second Amendment, ¶ 1.

30.     Section 4.2 of the BNT Sublicense states that "[BioNTech] will pay all royalties,

fees and other payments due to [Penn] under Sections 3.3, 3.4 and 3.6 within ████████ days after

the end of the Quarter in which the royalties, fees or other payments accrued." BNT Sublicense,

§ 4.2; BNT Second Amendment, ¶ 1.

31.     Following the completion of the first quarter with royalty bearing sales and

continuing until August 15, 2022, on a quarterly basis, BioNTech submitted a statement detailing

the proportion of worldwide sales that it believed were royalty bearing and asked Penn to submit

an invoice. In response, Penn prepared an invoice for the amount that BioNTech calculated in its

quarterly report. Penn's invoice to BioNTech included the following objection: "Amounts

invoiced may not represent all amounts owed to Penn. Penn reserves all of its rights under the

[BNT Sublicense]." Then, on November 17, 2022, BioNTech started sending payment with its

quarterly statement detailing the proportion of worldwide sales that it believed were royalty bearing, thereby eliminating the need for Penn to submit a quarterly invoice.

### BioNTech Can Reduce its Royalty Obligation Only Under Certain Circumstances

32.     BioNTech has the right to reduce its ████ royalty obligation if BioNTech must pay additional, specifically defined Third Party Royalties for a Licensed Product.

33.     The BNT Sublicense defines "Third Party Royalties" as "any royalty obligation in excess of ███████████████████ that [BioNTech] or an Affiliate or a Third Party sublicensee owes to one or more other parties pursuant to one or more licenses for patent rights comprising ████████████████████████████████████████████ ████████████████████████████████ and that are determined to be necessary to avoid infringement-related litigation with respect to the manufacture, use or sale of any Licensed Product." BNT Sublicense, § 3.4.3.

34.     Specifically, under Section 3.4.3, if BioNTech is required to pay Third Party Royalties for a Licensed Product, then BioNTech "may deduct ████████████████ of such Third Party Royalties from any royalties on Net Sales in Field of Use B due to [Penn] . . . provided that: (a) on an ongoing basis and prior to reduction of any royalty on Net Sales for a given calendar quarter, [BioNTech] first provides written evidence to Cellscript [and Penn] of [BioNTech's] or applicable sublicensee's obligation to pay such Third Party Royalties[.]" BNT Sublicense, § 3.4.3; BNT Second Amendment, ¶¶ 1, 3.

### BioNTech's Mandatory Accounting and Auditing Duties

35.     Under the BNT Sublicense, BioNTech owes accounting and auditing duties to Penn. Specifically, Section 4.1 of the BNT Sublicense requires BioNTech to furnish royalty reports

█████████ after the end of each quarter. The royalty reports must detail the calculation of all royalties, fees, and other payments due to Penn. The royalty reports must contain, at a minimum:



BNT Sublicense, § 4.1; BNT Second Amendment, ¶ 3. The reporting obligations set forth in this paragraph are referred to herein as "Royalty Reports."

36.     Section 4.3 of the BNT Sublicense requires BioNTech to maintain accurate books, records and related background information to verify Sales, Net Sales, and all royalties due or paid under the BNT Sublicense for at least █████. BNT Sublicense, § 4.3.

37.     Further, under Section 4.4 of the BNT Sublicense, "once annual Sales of Licensed Products exceed ██████████████████ [BioNTech] will conduct, at least once every ████████ years at its own expense, an independent audit of Sales, Net Sales, and all of the royalties, fees, and other payments due or paid under [the BNT Sublicense][.]" BNT Sublicense, § 4.4; BNT Second Amendment, ¶ 3. Once BioNTech's mandatory independent audit is complete, BioNTech must "provide to [Penn] a copy of the report of the independent auditors along with any underpayments and interest thereon." BNT Sublicense, § 4.4; BNT Second Amendment, ¶ 3.

38.     Finally, the BNT Sublicense sets forth that "[a]ll amounts that are not paid by [BioNTech] when due will accrue interest from the date due until paid at a rate equal to ████ ████████████ (or the maximum allowed by law, if less)." BNT Sublicense, § 4.7.

**BioNTech Uses Drs. Karikó and Weissman's Innovations to Develop Its Safe and Effective mRNA Vaccine**

39.     SARS-CoV-2, the respiratory virus that causes COVID-19, emerged in late 2019, leading to a devastating pandemic within a matter of months. Upon the emergence of this novel coronavirus, BioNTech leveraged the groundbreaking, patented mRNA-based innovations of Drs. Karikó and Weissman to rapidly develop its vaccine to COVID-19, Comirnaty®.

40.     BioNTech sold Comirnaty® around the globe, triggering BioNTech's obligation to pay Penn ████ royalty on Net Sales, subject to reduction under the conditions detailed above.

**BioNTech Underpays Royalties Owed for Sales of Comirnaty®**

41.     BioNTech has paid only a portion of the royalties it owes to Penn under the BNT Sublicense. BioNTech is not paying and has not paid the full amount of royalties due to Penn on BioNTech's worldwide sales of Comirnaty®.

42.     Upon information and belief, the mRNA in Comirnaty® is manufactured only in countries where Penn has mRNA Patent Rights,[5] from which it is then distributed around the world.

43.     Absent a sublicense, the making, use, importation, offer for sale, or sale of BioNTech's Comirnaty® would therefore infringe Penn's mRNA Patent Rights, including, for

---

[5] FDA, CBER CMC BLA Review Memorandum, U.S. FOOD & DRUG ADMINISTRATION, at 24-25, available at https://www.fda.gov/media/152252/download?attachment; Summary of Product Characteristics, EUROPEAN MEDICINES AGENCY, at 18, https://ec.europa.eu/health/documents/community-register/2021/20210713152604/anx_152604_en.pdf.

example, (i) the '966 Patent and the '824 Patent in the United States and (ii) the '685 Patent and the '266 Patent in the European Union.

44.     As a result, all Comirnaty® is a Licensed Product under the terms of the BNT Sublicense.

45.     But according to the limited accounting information provided by BioNTech to Penn, BioNTech is not paying royalties on all its worldwide sales of Comirnaty®. Accordingly, BioNTech is paying royalties on a smaller base of sales than that required by the BNT Sublicense, in breach of BioNTech's contractual obligations to Penn.

### BioNTech Underpays Royalties by Improperly Applying Its Royalty Reduction Rights

46.     BioNTech is further breaching its contractual obligations to Penn by inappropriately applying a royalty reduction for alleged royalty payments to third parties.

47.     In addition to Penn, BioNTech states that it pays royalties on Comirnaty® to non-party ACUITAS, non-party TRON, and non-party NIH.

48.     Under the terms of the BNT Sublicense, BioNTech may reduce its royalty obligations to Penn only when (i) its royalty payments to third parties—such as ACUITAS, TRON, and NIH—████████████████████████████████ (ii) the third-party sublicenses are "determined to be necessary to avoid infringement-related litigation with respect to the manufacture, use or sale of any Licensed Product," and (iii) BioNTech has provided written evidence of its obligation to pay Third Party Royalties. BNT Sublicense, § 3.4.3.

49.     According to the limited accounting information provided by BioNTech to Penn, BioNTech's obligations to pay royalties to third parties such as ACUITAS, TRON, and NIH never exceeded that certain and defined percentage of ████. Any royalties paid to ACUITAS, TRON,

and NIH therefore never met the definition of Third Party Royalties that permits BioNTech to reduce its royalty obligation to Penn under the BNT Sublicense.

50.     Further, BioNTech has never provided written evidence of its obligation to pay Third Party Royalties or that those sublicenses are necessary to avoid infringement-related litigation for the manufacture, use, or sale of Comirnaty®.

51.     Nonetheless, BioNTech has inappropriately reduced its royalty payments to Penn for every financial quarter in which it has had Sales of Comirnaty®, as is evident from the limited accounting information that BioNTech provided to Penn showing deductions for royalties paid to third parties without substantiating that BioNTech's royalty obligations ever exceeded the required percentage to qualify as Third Party Royalties.

52.     On information and belief, BioNTech's royalty payments to third parties never exceeded the required percentage to qualify as Third Party Royalties, nor has BioNTech calculated any purported reduction correctly by limiting its deduction to ███████████████ ██████ threshold that defines Third Party Royalties.

53.     Accordingly, BioNTech is paying a royalty amount that is less than that required by the BNT Sublicense, in breach of BioNTech's contractual obligations.

**BioNTech Fails to Satisfy its Accounting and Auditing Duties**

54.     BioNTech has not performed its accounting and auditing duties under the BNT Sublicense.

55.     Under the agreed terms of the BNT Sublicense, BioNTech is required to (i) furnish detailed royalty reports within ██████ after the end of each quarter (BNT Sublicense, § 4.1; BNT Second Amendment, ¶ 3) and (ii) pay for and conduct an independent audit every ██████ from the time that annual Sales of Licensed Products exceed ██████████████████ (BNT Sublicense, § 4.4). *See* ¶¶ 35–37, *supra*. BioNTech has not performed these duties.

56.     BioNTech failed to ███████████████████████████████████ ██████████████████████████████████████████, in breach of its duty to do so under the BNT Sublicense.

57.     Despite exceeding ████████████████████████████ ██████,[6] BioNTech has not performed a ████████ audit or provided Penn with the resulting report, in breach of its duty to do so under the BNT Sublicense. In a report dated September 20, 2022, ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████

## Penn May Proceed Directly Against BioNTech

58.     Penn has standing to bring the instant lawsuit as an intended Third-Party Beneficiary of the BNT Sublicense between Cellscript and BioNTech. Upon consummation of the BNT Sublicense, Penn became the intended Third-Party Beneficiary, including for all royalty payments and reporting obligations owed by BioNTech. Furthermore, according to the BNT Second Amendment, BioNTech and Cellscript stipulated that "Penn is a third-party beneficiary of the [BNT Sublicense]." BNT Second Amendment, ¶ 4. In particular, under the BNT Second Amendment, "all payments owed by [BioNTech] to Cellscript under the [BNT Sublicense] shall be owed and paid directly to Penn." *Id.*, ¶ 1. Additionally, under the BNT Second Amendment,

---

[6] BioNTech generated $308 million in 2020 from sales of Comirnaty®. *See* Kevin Dunleavy, *Pfizer mRNA partner BioNTech reaped €19B last year but warns of lower prices in 2022*, FIERCEPHARMA.COM (Mar. 30, 2022, 11:08 AM), https://www.fiercepharma.com/pharma/biontech-reports-sales-eu1898-billion-2021-eu188-billion-coming-covid-19-vaccine-sales.

"[a]ll information, and reports concerning payments, including inventories, required under the [BNT Sublicense] shall be sent to . . . Penn[.]" *Id.* ¶ 3.

59.    Penn further has standing to bring the instant lawsuit, as Cellscript agreed that Penn

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████

### BioNTech Refused Penn's Attempts to Resolve the Licensing Dispute

60.    The BNT Sublicense states that "[i]f a dispute arises between the Parties concerning any right or duty under the [BNT Sublicense], then the Parties will confer, as soon as practicable, in an attempt to resolve the dispute." BNT Sublicense, § 15.10.

61.    ████████████████████████████████████████████, representatives from Penn and BioNTech conferred in an attempt to resolve the parties' dispute. In other words, Penn conferred with BioNTech in compliance with and in satisfaction of Section 15.10 of the BNT Sublicense prior to filing this action.[7]

### COUNT I: BREACH OF CONTRACT – BioNTech
### (Failure to Pay Royalties on Net Sales of Licensed Product)

62.    Penn adopts and incorporates by reference the allegations set forth in ¶¶ 1–61, *supra.*

63.    On July 19, 2017, BioNTech and Cellscript entered into a valid and enforceable Patent Sublicense Agreement, as amended by the BNT First Amendment and the BNT Second Amendment (i.e., the BNT Sublicense). The BNT Sublicense is a contract.

---

[7] All conditions precedent—███████████████████████████████████
███████████████████████—were satisfied prior to the filing of the lawsuit.

64.     Under the terms of the BNT Sublicense, BioNTech agreed to pay royalties on Net Sales of Licensed Product.

65.     By failing to pay royalties on all of its worldwide sales of Comirnaty®, BioNTech has failed to pay the full amount of royalties due on Net Sales of Licensed Product for its sale of Comirnaty®.

66.     BioNTech's failure to pay the full amount of royalties owed for Licensed Product, as required by the BNT Sublicense, constitutes a breach of the BNT Sublicense.

67.     Penn and Cellscript have substantially performed all obligations under the BNT Sublicense, including the obligation to confer with BioNTech in "an attempt to resolve [the Parties'] dispute." BNT Sublicense, § 15.10. In other words, Penn and Cellscript have performed all obligations owed to BioNTech under the terms of the BNT Sublicense.

68.     Penn has suffered damages as a direct and proximate result of BioNTech's breach, including through BioNTech's failure to pay all monies owed to Penn under the BNT Sublicense.

69.     BioNTech is liable to Penn.

### <u>COUNT II: BREACH OF CONTRACT – BioNTech</u>
### (Improper Royalty Reduction)

70.     Penn adopts and incorporates by reference the allegations set forth in ¶¶ 1–69, *supra*.

71.     On July 19, 2017, BioNTech and Cellscript entered into a valid and enforceable Patent Sublicense Agreement, as amended by the BNT First Amendment and the BNT Second Amendment (i.e., the BNT Sublicense). The BNT Sublicense is a contract.

72.     Under the terms of the BNT Sublicense, BioNTech has the right to reduce its royalty payments if and only if (i) ███████████████████████████████████████ ████████████████████████████████████, (ii) the third-party sublicenses are necessary to

avoid infringement-related litigation with respect to the manufacture, use, or sale of any Licensed Product, and (iii) BioNTech has provided written evidence of its obligation to pay such royalties.

73.     BioNTech's royalty payments to third parties never exceeded that certain and defined percentage of Net Sales of Licensed Product, and thus have ███████████████████ ████████████████████ Further, BioNTech has never provided written evidence of its obligation to pay royalties to third parties or demonstrated that those royalty payments are necessary to avoid infringement-related litigation with respect to the manufacture, use, or sale of Comirnaty®. Therefore, under the BNT Sublicense, BioNTech is not entitled to reduce royalty payments because of Third Party Royalties.

74.     Nonetheless, BioNTech reduced its royalty payments to Penn because of royalties it paid to third parties.

75.     BioNTech has improperly reduced payments to Penn in light of royalties paid to third parties in a manner not permitted by, and in breach of, the BNT Sublicense.

76.     Penn and Cellscript have substantially performed their obligations under the BNT Sublicense, including its obligation to confer with BioNTech in "an attempt to resolve [the Parties'] dispute." BNT Sublicense, § 15.10. In other words, Penn and Cellscript have performed all obligations owed to BioNTech under the terms of the BNT Sublicense.

77.     Penn has suffered damages as a direct and proximate result of BioNTech's breach, including through BioNTech's failure to pay all monies owed to Penn under the BNT Sublicense.

78.     BioNTech is liable to Penn.

### COUNT III: BREACH OF CONTRACT – BioNTech
#### (Failure to Perform Accounting and Auditing Duties)

79.     Penn adopts and incorporates by reference the allegations set forth in ¶¶ 1–78, *supra*.

80.    On July 19, 2017, BioNTech and Cellscript entered into a valid and enforceable Patent Sublicense Agreement, as amended by the BNT First Amendment and the BNT Second Amendment (i.e., the BNT Sublicense). The BNT Sublicense is a contract.

81.    BioNTech's failure to provide Royalty Reports that detail the calculation of all royalties, fees, and other payments due to Penn for such quarter constitutes a breach of the BNT Sublicense.

82.    BioNTech's failure to provide ███████ audit reports constitutes a breach of the BNT Sublicense.

83.    Penn and Cellscript have substantially performed all obligations under the BNT Sublicense, including its obligation to confer with BioNTech in "an attempt to resolve [the Parties'] dispute." BNT Sublicense, § 15.10. In other words, Penn and Cellscript have performed all obligations owed to BioNTech under the terms of the BNT Sublicense.

84.    Penn has suffered damages as a direct and proximate result of BioNTech's breach, including through its inability to accurately assess monies owed to Penn under the BNT Sublicense.

85.    BioNTech is liable to Penn.

### COUNT IV: UNJUST ENRICHMENT – BioNTech
#### (Alternative Claim for Relief)

86.    Penn adopts and incorporates by reference the allegations set forth in ¶¶ 1–85, *supra*.

87.    Penn pleads a claim for unjust enrichment in the alternative, in the event that BioNTech denies that a valid contract requires payment of the amounts claimed by Penn.

88.    Penn, through RTX and Cellscript, has involuntarily conferred a benefit on BioNTech of which BioNTech has knowledge.

89.     Penn, through RTX and Cellscript, conferred a benefit on BioNTech by licensing BioNTech to the mRNA Patent Right that permitted BioNTech to develop and commercialize its Comirnaty® vaccine.

90.     BioNTech has knowledge of and has appreciated the benefit conferred on it by Penn.

91.     BioNTech is a party to the BNT Sublicense. BioNTech's COVID-19 vaccine Comirnaty®, which is a "Licensed Product" under the BNT Sublicense, has achieved more than $75 billion in worldwide sales. BioNTech's Comirnaty® "would infringe" Penn's mRNA Patent Rights "in the absence of a sublicense" conferred by Penn, through its licensee RTX and sublicensee Cellscript.

92.     Appreciating this benefit conferred on it by Penn, through RTX and Cellscript, BioNTech has made partial payments of certain royalties to Penn required under the BNT Sublicense on its sales of Comirnaty®.

93.     But BioNTech has failed to fully pay certain royalties due to Penn under the BNT Sublicense.

94.     BioNTech has underpaid by remitting royalties on only a portion of Net Sales of Licensed Products in Field of Use B under the BNT Sublicense, through the exclusion of Net Sales in certain countries from its royalty calculations.

95.     BioNTech has underpaid by improperly deducting royalties paid to third parties from the royalties remitted to Penn, despite failing to ever have royalties that qualify as Third Party Royalties under the BNT Sublicense, a condition precedent for the right to make such deductions.

96.     BioNTech is therefore taking the benefit conferred upon it without providing full compensation to Penn in return.

97.     Allowing BioNTech to retain this shortfall on certain royalties due to Penn under the BNT Sublicense would be inequitable and unjust.

### JURY DEMAND

98.     Penn demands a trial by jury on all issues.

### PRAYER FOR RELIEF

WHEREFORE, Penn requests entry of a judgment in its favor and against BioNTech as follows:

(a)   Judgment that BioNTech breached its obligations under the terms of the BNT Sublicense;

(b)   Compelling BioNTech to comply with its contractual and accounting duties under the BNT Sublicense;

(c)   Compelling BioNTech to comply with an independent audit as set forth in the BNT Sublicense;

(d)   Awarding compensatory damages in an amount in excess of $75,000 (exclusive of interest and costs);

(e)   Awarding additional damages on account of pecuniary and consequential losses suffered by Penn in an appropriate amount to be determined;

(f)   Awarding pre- and post-judgment interest;

(g)   Awarding Penn's reasonable attorneys' fees and costs;

(h)   Awarding other and further relief as this Court and/or a jury may deem proper and just.

Dated:  August 5, 2024                           Respectfully submitted by,


                                                  */s/ Leslie Miller Greenspan*
                                                 Joe H. Tucker, Jr.
                                                 Leslie Miller Greenspan
                                                 **TUCKER LAW GROUP**
                                                 Ten Penn Center
                                                 1801 Market Street, Suite 2500
                                                 Philadelphia, PA 19103
                                                 jtucker@tlgattorneys.com
                                                 lgreenspan@tlgattorneys.com
                                                 (215) 875-0609

                                                 Jake M. Holdreith (*pro hac vice* forthcoming)
                                                 Christopher A. Pinahs (*pro hac vice* forthcoming)
                                                 **ROBINS KAPLAN LLP**
                                                 800 LaSalle Avenue, Suite 2800
                                                 Minneapolis, MN 55402
                                                 JHoldreith@RobinsKaplan.com
                                                 CPinahs@RobinsKaplan.com
                                                 (612) 349-8500

                                                 Manleen Singh (*pro hac vice* forthcoming)
                                                 ROBINS KAPLAN LLP
                                                 800 Boylston Street, Suite 2500
                                                 Boston, MA 02199
                                                 MSingh@RobinsKaplan.com
                                                 (617) 267-2300

                                                 ***Attorney for Plaintiff The Trustees of the University of Pennsylvania***